# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

JUN 2 1 2010

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | **Criminal No.** |
| v. | § | |
| | § | |
| CLIFFORD UBANI, | § | # H-10- 416 |
| EZINNE UBANI, | § | |
| PRINCEWILL NJOKU, | § | |
| CAROLINE NJOKU, | § | |
| MARY ELLIS, | § | |
| MICHELLE TURNER, and | § | |
| CYNTHIA GARZA-WILLIAMS, | § | |
| | § | |
| Defendants. | § | |

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federal healthcare program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who received benefits under Medicare where referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.    "Part A" of the Medicare program covered certain eligible home healthcare costs for medical services provided by a home health agency ("HHA") to beneficiaries that required home healthcare services because of an illness or disability that caused them to be homebound. Payments for home healthcare medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4.    Physicians, clinics and other healthcare providers, including HHAs that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A healthcare provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that had been performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other healthcare provider that ordered the services.

5.    CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Texas, CMS contracted with Trailblazers Health Enterprises (Trailblazers) to administer Part A HHA claims. As administrator, Trailblazers received, adjudicated and paid claims submitted by HHA providers under the Part A program for home healthcare claims. Additionally, CMS separately contracted with companies in order to review HHA providers' claims data. CMS first contracted with TriCenturion, a Program Safeguard Contractor. Subsequently, CMS contracted with Health

Integrity, a Zone Program Integrity Contractor.  Health Integrity reviewed HHA provider's claims for potential fraud, waste and abuse.

## Part A Coverage and Regulations

### Reimbursements

6.     The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home healthcare services only if the patient qualified for home healthcare benefits.  A patient qualifies for home healthcare benefits only if the patient:

a.     was confined to the home, also referred to as homebound;

b.     was under the care of a physician who specifically determined there was a need for home healthcare and established the Plan of Care ("POC"); and

c.     the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy, the beneficiary was confined to the home, that a POC for furnishing services was established and periodically reviewed, and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7.     HHAs were reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care."  The base payment was adjusted based on the health condition and care needs of the beneficiary.  This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition.  If a beneficiary

was still eligible for care after the end of the first episode of care, a second episode could commence. There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary remained eligible.

8.      In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently received a portion of their reimbursement payment in advance. At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be reimbursed. As explained in more detail below, "Outlier Payments" are additional PPS reimbursements based on visits in excess of the norm. Trailblazers paid Outlier Payments to HHA providers under PPS when the providers' RAP submission established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

## Record Keeping Requirements

9.      Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the home health agency. These medical records were required to be sufficient to permit Medicare, through Trailblazers and other contractors, to review the appropriateness of Medicare payments made to the home health agency under the Part A program.

10.      Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home healthcare, diagnoses, types of services/frequency of visits,

prognosis/rehabilitation potential, functional limitations/activities permitted, medications/ treatments/ nutritional requirements, safety measures/discharge plans, goals, and physician signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services, and an OASIS.

11.     Medicare Part A regulations required provider HHAs to maintain medical records of each visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

## Special Outlier Provision

12.     While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, an "outlier" provision existed to ensure appropriate payment for those beneficiaries that have the most extensive care needs, which may result in an Outlier Payment to the HHA. Outlier Payments are additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary including the sickest

beneficiaries ensured that all beneficiaries had access to home health services for which they are eligible.

13.     Medicare regulations allowed certified HHAs to subcontract home healthcare services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified HHA.  That certified agency billed Medicare for all services to the patient.  The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees.

14.     For beneficiaries for whom skilled nursing was medically necessary, Medicare paid for such skilled nursing provided by an HHA.  The basic requirement that a physician certify that a beneficiary be confined to the home or homebound, as certified by a physician was a continuing requirement for a Medicare beneficiary to receive such home healthcare benefits.

## Family Healthcare Services

15.     Family Healthcare Group, Inc. dba Family Healthcare Services (Family) was a Texas corporation incorporated on or about November 1, 2004, that did business in Harris County, Texas, as a home healthcare provider.  Family was initially located at 8915 North Deer Meadow, Houston, Texas.  In or about 2006, Family purportedly moved its home healthcare business to 8313 S.W. Freeway, Suite 109, Houston, Texas.  From in or about April 2006 through in or about August 2009, Family was paid approximately $5,200,000 by Medicare for purportedly providing home healthcare services.

## The Defendants

16.     Defendant **CLIFFORD UBANI**, a resident of Harris County, Texas, was an owner and operator of Family.  He was Family's chief financial officer.

17.     Defendant **EZINNE UBANI,** a resident of Harris County, Texas, was an owner and operator of Family.  She was also a registered nurse licensed by the State of Texas and purportedly provided home healthcare services to beneficiaries referred to Family.

18.     Defendant **PRINCEWILL NJOKU,** a resident of Harris County, Texas, was an owner and operator of Family.  He was also a registered nurse licensed by the State of Texas and purportedly provided home healthcare services to beneficiaries referred to Family.

19.     Defendant **CAROLINE NJOKU,** a resident of Harris County, Texas, was an owner and operator of Family.  She was a vocational nurse licensed by the State of Texas and referred beneficiaries to Family so that fraudulent claims could be filed with Medicare for services not medically necessary and/or not rendered.

20.     Defendant **MARY ELLIS,** a resident of Fort Bend County, Texas, was a vocational nurse licensed by the State of Texas and referred beneficiaries to Family so that fraudulent claims could be filed with Medicare for services not medically necessary and/or not rendered.  She also purportedly provided home healthcare services to beneficiaries referred to Family.

21.     Defendant **MICHELLE TURNER,** a resident of Harris County, Texas, referred beneficiaries to Family so that fraudulent claims could be filed with Medicare for services not medically necessary and/or not rendered.

22.     Defendant **CYNTHIA GARZA-WILLIAMS,** a resident of Harris County, Texas, referred beneficiaries to Family so that fraudulent claims could be filed with Medicare for services not medically necessary and/or not rendered.

## COUNT 1
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

23.     Paragraphs 1 through 22 of the General Allegations section of this Indictment are

realleged and incorporated by reference as if fully set forth herein.

24.     From in or around April 2006 through August 2009, the exact dates being

unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and

elsewhere, defendants,

**CLIFFORD UBANI,**
**EZINNE UBANI,**
**PRINCEWILL NJOKU,**
**CAROLINE NJOKU,**
**MARY ELLIS,**
**MICHELLE TURNER, and**
**CYNTHIA GARZA-WILLIAMS**

did knowingly and willfully combine, conspire, confederate and agree with each other and with

others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section

1347, that is, to execute a scheme and artifice to defraud a healthcare benefit program affecting

commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to

obtain, by means of materially false and fraudulent pretenses, representations, and promises,

money and property owned by, and under the custody and control of, said healthcare benefit

program, in connection with the delivery of and payment for health care benefits, items, and

services.

### Purpose of the Conspiracy

25.     It was a purpose of the conspiracy for defendants to unlawfully enrich themselves

by, among other things, (a) accepting and receiving kickbacks and bribes in exchange for

providing false and fraudulent prescriptions, medical certifications and POCs, and for arranging for the use of Medicare beneficiary numbers as the bases of claims filed for home healthcare; (b) causing the submission and concealment of false and fraudulent claims to Medicare, the receipt and transfer of the proceeds from the fraud, and the payment of kickbacks; and (c) causing the diversion of the proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and other co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

26.     **CAROLINE NJOKU, MARY ELLIS, MICHELLE TURNER, CYNTHIA GARZA-WILLIAMS,** and other co-conspirators, known and unknown, recruited Medicare beneficiaries so that they could be placed at Family for skilled nursing.  Family billed Medicare for skilled nursing when such services were not medically necessary and/or not rendered.  In return, **CAROLINE NJOKU, MARY ELLIS, MICHELLE TURNER** and **CYNTHIA GARZA-WILLIAMS** were paid kickbacks by **CLIFFORD UBANI and PRINCEWILL NJOKU** for referring beneficiaries.

27.     **EZINNE UBANI, PRINCEWILL NJOKU, MARY ELLIS, CYNTHIA GARZA-WILLIAMS,** and other co-conspirators, known and unknown, falsified patient files to make it appear that Medicare beneficiaries qualified for and received services that were not medically necessary and/or not provided.  Specifically, when conducting the Outcome and Assessment Information Set ("OASIS"), **E. UBANI, P. NJOKU, ELLIS, and GARZA-**

**WILLIAMS** falsified patient files to make sure the beneficiary qualified for services that were not medically necessary and/or not provided.

28.     **EZINNE UBANI, PRINCEWILL NJOKU and MARY ELLIS** falsified patient files to make it appear that Medicare beneficiaries received services that were not provided.  Specifically, when conducting home healthcare visits to the beneficiaries' homes, **E.UBANI, P. NJOKU and ELLIS** falsified patient files to make it appear that they provided skilled nursing care when no such care was provided.

29.     **EZINNE UBANI and PRINCEWILL NJOKU** and other co-conspirators, known and unknown, approved POCs that were not medically necessary. Specifically, if additional home healthcare was needed after the initial 60-day episode of care was provided, the home healthcare company was required to provide a re-certification.  **E.UBANI and P. NJOKU** provided re-certifications when they knew the beneficiaries did not require any further home healthcare.

30.     **CLIFFORD UBANI, PRINCEWILL NJOKU, EZINNE UBANI and CAROLINE NJOKU** submitted fraudulent claims to Medicare by billing for skilled nursing when such services were not medically necessary and/or not rendered.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2-11
### Kickbacks
### (42 U.S.C. § 1320a-7b and 18 U.S.C. § 2)

31.     Paragraphs 1 through 30 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

32.     On or about the dates enumerated below, at Harris County, in the Southern District of Texas, and elsewhere, the defendants as set forth below, did knowingly and willfully offer, pay, solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare:

| Count | Defendants | On or About Date | Approximate Amount of Kickback Received |
|-------|------------|------------------|------------------------------------------|
| 2 | **MARY ELLIS, CLIFFORD UBANI and PRINCEWILL NJOKU** | April 23, 2007 | $1,200 |
| 3 | **MARY ELLIS, CLIFFORD UBANI and PRINCEWILL NJOKU** | February 12, 2008 | $2,000 |
| 4 | **MARY ELLIS, CLIFFORD UBANI and PRINCEWILL NJOKU** | April 30, 2008 | $800 |
| 5 | **CYNTHIA GARZA-WILLIAMS, CLIFFORD UBANI and PRINCEWILL NJOKU** | January 10, 2008 | $400 |
| 6 | **CYNTHIA GARZA-WILLIAMS, CLIFFORD UBANI and PRINCEWILL NJOKU** | January 15, 2008 | $400 |
| 7 | **CYNTHIA GARZA-WILLIAMS, CLIFFORD UBANI and PRINCEWILL NJOKU** | April 21, 2008 | $400 |
| 8 | **MICHELLE TURNER, CLIFFORD UBANI and PRINCEWILL NJOKU** | May 11, 2007 | $2,000 |

| Count | Defendants | On or About Date | Approximate Amount of Kickback Received |
|---|---|---|---|
| 9 | MICHELLE TURNER, CLIFFORD UBANI and PRINCEWILL NJOKU | June 3, 2008 | $800 |
| 10 | MICHELLE TURNER, CLIFFORD UBANI and PRINCEWILL NJOKU | October 27, 2008 | $3,200 |
| 11 | CAROLINE NJOKU, CLIFFORD UBANI and PRINCEWILL NJOKU | November 10, 2008 | $2,500 |

In violation of Title 42, United States Code, Section 1320a-7b and Title 18, United States Code, Section 2.

## COUNTS 12-15
### False Statements for Use in
### Determining Rights for Benefit and Payment by Medicare
### (42 U.S.C. § 1320a-7b and 18 U.S.C. § 2)

33.     Paragraphs 1 through 32 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

34.     On or about the dates enumerated below, at Harris County, in the Southern District of Texas, and elsewhere, the defendants as set forth below, did knowingly and willfully make and cause to be made false statements and representations of material facts, as set forth below, in patient files for the beneficiaries set forth below, for use in determining rights for any benefit and payment under a Federal healthcare program, that is, Medicare:

| Count | Defendant(s) | Approximate Dates | Medicare Beneficiary | False Statement and Representation |
|---|---|---|---|---|
| 12 | PRINCEWILL NJOKU | 04/09- 08/09 | S.A. | Describing symptoms that were not-existent and services that were not rendered |

| Count | Defendant(s) | Approximate Dates | Medicare Beneficiary | False Statement and Representation |
|-------|--------------|-------------------|----------------------|-----------------------------------|
| 13 | EZINNE UBANI, PRINCEWILL NJOKU and MARY ELLIS | 04/08-08/09 | H.A. | Describing symptoms that were not-existent and services that were not rendered |
| 14 | EZINNE UBANI, PRINCEWILL NJOKU and MARY ELLIS | 06/08-08/09 | J.A. | Describing symptoms that were not-existent and services that were not rendered |
| 15 | PRINCEWILL NJOKU | 05/09 | R.M. | Describing symptoms that were not-existent and services that were not rendered |

In violation of Title 42, United States Code, Section 1320a-7b(a)(2) and Title 18, United States Code, Section 2.

## FORFEITURE
### (18 U.S.C. § 982)

35.     The allegations contained in Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which **CLIFFORD UBANI, PRINCEWILL NJOKU, EZINNE UBANI, CAROLINE NJOKU, MARY ELLIS, MICHELLE TURNER and CYNTHIA GARZA-WILLIAMS,** have an interest pursuant to Title 18, United States Code, Section 982.

36.     Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of, **CLIFFORD UBANI, PRINCEWILL NJOKU, EZINNE UBANI, CAROLINE NJOKU, MARY ELLIS, MICHELLE TURNER and CYNTHIA GARZA-WILLIAMS,** for the health care fraud offense charged in Count 1 of this Indictment, the defendants shall forfeit to the

United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.  The property subject to forfeiture is approximately $5,200,000.

37.     If any of the property described above, as a result of any act or omission of the defendants:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(I).

All pursuant to Title 18, United States Code, Section 982(a)(7).

A TRUE BILL

ORIGINAL SIGNATURE ON FILE

FOREPERSON

JOSE ANGEL MORENO
UNITED STATES ATTORNEY

CHARLES D. REED
SAM S. SHELDON
TRIAL ATTORNEYS
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE